**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| WILLIE GRANT, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:09-CV-1848-RWS |
| BERT BELL / PETE ROZELLE | : | |
| NFL PLAYER RETIREMENT | : | |
| PLAN, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## ORDER

This case comes before the Court on Plaintiff's Motion for Judgment [13]

and Defendant's Motion for Summary Judgment [12].  After considering the

record, the Court enters the following order.

### Background

Plaintiff Willie Grant appeals the denial of line-of-duty ("LOD")

disability benefits provided under the Defendant Bert Bell/Pete Rozelle NFL

Player Retirement Plan ("Plan"), an employee benefit plan governed by the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§

1001, *et seq*.  Grant is a former National Football League ("NFL") player and is

a participant in the retirement plan at issue by virtue of his NFL career.

(Defendant's Statement of Undisputed Material Facts ("DSUMF"), Dkt. [18] at

¶¶ 1, 3).   The Plan, the product of a collective bargaining agreement between

the National Football League Players Association[1] ("NFLPA") and the National

Football League Management Council[2] ("NFLMC"), is a retirement plan that

provides retirement, disability, and related benefits to eligible NFL players.  (Id.

at ¶¶ 4, 5).

On March 12, 2008, the Plan received an application for LOD disability

benefits submitted by Grant's counsel.  (Id. at ¶¶ 21, 22).  The pertinent Plan

terms for entitlement to LOD benefits are as follows:

> 6.1    Line-of-Duty Disability Benefits
>
> Any Player who incurs a "substantial disablement" (as defined in
> Section 6.4(a) and (b)) "arising out of League football activities" . .
> . will receive a monthly line-of-duty disability benefit . . .
> continuing for the duration of such substantial disablement but not
> for longer than 90 months.
>
> 6.4    Definitions
>        (a) For applications received on or after May 1, 2002, a
>        "substantial disablement" is a permanent disability that . . .

---

[1] The NFLPA is the sole and exclusive bargaining representative of NFL players.  (DSUMF at ¶ 6).

[2] The NFLMC is the sole and exclusive bargaining representative of the NFL teams, which are the employers in the context of the Plan.  (DSUMF at ¶ 7).

2

> (4) For orthopedic impairments, using the American Medical Association *Guides to the Evaluation of Permanent Impairments* (Fifth Edition, Chicago, IL) ("AMA Guides"), is (a) a 38% or greater loss of use of the entire lower extremity; (b) a 23% or greater loss of use of the entire upper extremity; (c) an impairment to the cervical or thoracic spine that results in a 25% or greater whole body impairment; (d) an impairment to the lumbar spine that results in a 20% or greater whole body impairment; or (e) any combination of lower extremity, upper extremity, and spine impairments that results in a 25% whole body impairment.
>
> In accordance with the AMA Guides, up to three percentage points may be added for excess pain in each category above ((a) through (e)).

(Id. at ¶ 23).

In order to evaluate Plaintiff's LOD benefits claim, Plaintiff was referred by the Plan to Terry L. Thompson, M.D., an orthopaedist, for a medical evaluation.[3]  (Id. at ¶ 25).  Dr. Thompson's examination of Plaintiff on April 9, 2008 focused on Plaintiff's left hip, knees, elbows, and right small finger. (Administrative Record ("AR") at 307-315).  Dr. Thompson rated Plaintiff's upper extremity impairment ("UEI") at 1%, lower extremity impairment ("LEI") at 15%, and the combined whole person impairment ("WPI") (*i.e.*,

---

[3] Plaintiff objects to the classification of any of the doctors to whom the Plan referred Plaintiff as "independent" or "neutral."  (Plaintiff's Response Opposing DSUMF ("DSUMF Response") Dkt. [18] at ¶ 25).

"whole body impairment") at 9% with an upward adjustment for pain of 2%.[4]
(Id. at 308).  Dr. Thompson's findings failed to meet the Plan's standard for
receipt of LOD benefits under Section 6.4(a)(4) and the Disability Committee[5]
denied Plaintiff's claim for benefits.  (Id. at 323-34).  Plaintiff was informed
that he could appeal the Committee's decision to the Plan's Retirement Board.
(Id. at 323).

Plaintiff appealed the Disability Committee's decision to deny his claim
for LOD benefits to the Retirement Board ("Board").  (DSUMF at ¶ 30).  The
Board consists of three voting members appointed by the NFLPA and three
voting members appointed by the NFLMC and is the named fiduciary with
decision-making authority under the Plan.  (Id. at ¶¶ 12, 13).  The Board has full
and absolute discretion to, *inter alia*, define and interpret the terms of the Plan,
decide claims for benefits under the Plan, and generally manage and administer
the Plan.  (Id. at ¶ 14).  If the voting members of the Board are deadlocked with

---

[4] Plaintiff claims that Dr. Thompson failed to properly evaluate all of Plaintiff's
impairments as evidenced by his lack of findings in regards to Plaintiff's left hip, left
knee, or lower back.  (DSUMF Response at ¶ 28).

[5] The Disability Initial Claims Committee ("Disability Committee") is
responsible for deciding all initial claims for disability benefits under the Plan.
(DSUMF at ¶ 9).  It consists of two members, one appointed by the NFLPA and one
appointed by the NFLMC.  (Id. at ¶ 10).  Appeals of decisions made by the Disability
Committee are heard by the Retirement Board. (Id. at ¶ 11).

AO 72A
(Rev.8/82)

respect to a medical decision, including "whether an applicant meets the requisite percentage disability requirements to be eligible for line-of-duty disability benefits," the Board may submit the dispute concerning the medical decision to a Medical Advisory Physician.  (Retirement Plan at §8.3(a), AR at 001GG-001HH).  When such a medical dispute is submitted to a MAP, the MAP is required to make a "final and binding determination regarding such medical issues."  (Id.).  The Retirement Plan states that the MAP has "full and absolute discretion, authority and power to decide such medical issues."  (Id.).

Shortly after submitting an appeal to the Board, Plaintiff underwent an evaluation by Phillip R. Langer, M.D. on December 18, 2008.[6]  Dr. Langer rated Plaintiff's LEI at 59% and WPI at 32%.  (AR at 354-355).  Both Dr. Langer's ratings of Plaintiff's LEI and WPI met the threshold qualification levels for LOD benefits.  (Section 6.4(a)(4), AR at 001CC).  In connection with the appeal, the Plan arranged for another medical evaluation by orthopaedist Glenn Perry, M.D.  (DSUMF at ¶ 33).  Dr. Perry rated Plaintiff's UEI at 4%, his

---

[6] Defendant does not contest that Dr. Langer is well-qualified to perform the type of orthopaedic examination necessary to determine the level of Plaintiff's impairments.  After evaluating Dr. Langer's *curriculum vitae* (AR at 335-344), it is clear that Dr. Langer is well qualified to make such a determination.

LEI at 35%, and his lumbar spine at 8%, for a combined WPI rating of 25%,[7] including an upward adjustment for pain of 2%.   (DSUMF at ¶¶ 36-39).  Dr. Perry's rating of Plaintiff's WPI met the Plan's threshold for LOD benefits. (Section 6.4(a)(4), AR at 001CC).

The Retirement Board asked its Medical Director to comment on the ratings of the Plan's physicians.  (DSUMF at ¶ 40).  It does not appear that the Board asked its Medical Director to comment on Dr. Langer's findings. Following the Medical Director's suggestion, the Board decided to refer Plaintiff to a MAP for evaluation.  (Id. at ¶ 42).  The MAP that evaluated Plaintiff was Bernard R. Bach, Jr., M.D., an orthopaedist.  (Id. at ¶ 44).  Dr. Bach evaluated Plaintiff on March 16, 2009, and rated this UEI at 2%, his lumbar spine WPI at 8%, his LEI at 43%, and his combined WPI at 28%.[8] (Id. at ¶¶ 46-52).  Dr. Bach's rating of Plaintiff's LEI and WPI each independently met the Plan's threshold for the receipt of LOD benefits. (Section 6.4(a)(4), AR at 001CC).

---

[7] Plaintiff contends that Dr. Perry's actual finding from his examination of Plaintiff demonstrates a greater WPI than was calculated on his report.  (DSUMF Response at ¶ 39).

[8] Plaintiff contends that Dr. Bach's examination suffered from several shortcomings, including the fact that a lot of the examination was performed by another individual and Dr. Bach's actual examination of Plaintiff was cursory in nature.  (DSUMF Response at ¶ 47).

AO 72A
(Rev.8/82)

On March 26, 2009, the Plan Office sent Dr. Bach a memorandum acknowledging receipt of his evaluation and asking him to review his findings for compliance with the AMA Guides.[9]   (AR 461-462).  Specifically, the Plan Office commented on his findings in regards to Plaintiffs right little finger, elbows, left hip, left knee, and right knee.  (Id.).   With regard to Plaintiff's right little finger and left hip, the Plan Office noted that Dr. Bach's impairment ratings were not consistent with the AMA Guides.  (Id.).  With regard to Dr. Bach's rating of Plaintiff's knees, the Plan Office noted that he combined values that should not be combined in determining the impairment percentage. (Id. at 461).  Finally, with regard to Dr. Bach's ratings of Plaintiff's elbows, the Plan Office noted that Dr. Bach's measurement of elbow flexion was a ratable impairment, but Dr. Bach attributed a 0% impairment to Plaintiff's elbows.  (Id. at 461).  The Plan Office asked Dr. Bach to "review [his] Physician's Report Form and narrative and submit any changes/comments to the Plan Office by **Monday, March 30, 2009**."  (Id. at 462 (emphasis in original)).

---

[9] The Court does not agree with Plaintiff's characterization of the Board's letter to Dr. Bach as a "request to lower the impairment ratings."  (Dkt. [15] at 5).   As noted below, the Board also noted that Dr. Bach failed to rate Plaintiff's elbow as an impairment.  However, it is true that the majority of the Board's observations as to the AMA guides led to lower ratings.

On April 17, 2009, Dr. Bach sent a letter to the Plan Office noting that following his review of his examination and findings he was updating his WPI rating of Plaintiff to 24%.[10]  (AR at 469).  In that letter, Dr. Bach also stated:

> As I commented to you at our symposium in Dallas regarding Mr. Grant, the range of motion that he has, although it would qualify him based on goniometric measurements as symmetric to his opposite elbow, he does not have arthritis in his elbows and I do not believe *despite the fact that the AMA Guide to Impairment would credit him with a potential impairment for his elbow based on flexion*, that this is symmetric and related to his biceps bulk.

(Id. (emphasis added)).

On May 27, 2009, the Board notified Plaintiff that it was denying Plaintiff's appeal and affirming the earlier denial of LOD benefits.  (AR at 479). The Board noted that "[b]ased on Dr. Bach's final and binding impairment rating, the Retirement Board concluded that Mr. Grant does not have a substantial disablement within the meaning of the Plan."[11]  (Id.).  The threshold

---

[10]  Plaintiff objects that Dr. Bach's actual findings from his examination demonstrate a greater WPI than was calculated on his revised report.  (See Plaintiff's Additional Material Facts, Dkt. [18] at ¶¶ 7, 8, 11, 12).

[11]  The letter notifying Plaintiff of the denial of benefits states that "[b]y report dated March 16, 2009, MAP Bernard Bach rated Mr. Grant's [UEI] at 3%, [LEI] at 33%, lumbar spine impairment at 8%, with the combined WPI at 22%, plus 2% for pain."  However, Dr. Bach's March 16, 2009 report rated Plaintiff's WPI at 28%. (AR at 448-457).  It was not until Dr. Bach's April 17, 2009 letter to the Board that his findings were revised downward to reflect a WPI rating of 24%.  (AR at 469).

8

impairment level necessary to qualify for LOD benefits is an LEI of 38% or a WPI of 25%. (AR at 001CC). The Board also acknowledged Plaintiff's criticism of Dr. Bach's actual examination of Plaintiff, but stated that his impairment ratings are binding and final. (AR at 479). The letter, while referring to Dr. Thompson's and Dr. Perry's impairment ratings of Plaintiff, makes no reference to Dr. Langer's impairment ratings.

Plaintiff has brought the current action to appeal the finding of the Retirement Board.

## Discussion

ERISA was enacted by Congress "to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 830, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)). ERISA requires that benefit plan procedures "afford a reasonable opportunity . . . for a full and fair review" of dispositions adverse to the claimant and clear communication to the claimant of the "specific reasons" for benefit denials. 29 U.S.C. § 1133(2); 29 CFR § 2560.503-1(g)(1)(i). In order for the review to qualify as a "full and fair review," the administrator must "[p]rovide . . . upon

9

request . . . all documents, records, and other information relevant to the

claimant's claim for benefits." 29 C.F.R. 2560.503-1(h)(2)(iii).  ERISA also

allows a person denied benefits under an employee benefit plan to challenge

that denial in federal court.  29 U.S.C. § 1132(a)(1)(B).

Both parties have filed cross-motions for summary judgment.[12]  ERISA

does not set out standards district courts must use in reviewing an

administrator's decision to deny benefits.  <u>Doyle v. Liberty Life Assurance Co.</u>,

542 F.3d 1352, 1355 (11th Cir. 2008) (citing <u>Firestone Tire</u>, 489 U.S. at 109).

The "typical summary judgment analysis does not apply in ERISA cases."

<u>Ruple v. Hartford Life and Accident Ins. Co.</u>, 340 Fed. Appx. 604, 611 (11th

Cir. 2009).  Rather, the Eleventh Circuit in <u>Williams v. BellSouth Telecomms.</u>,

<u>Inc.</u>, 373 F.3d 1132 (11th Cir. 2004), established a six-step framework "for use

in judicially reviewing virtually *all* ERISA-plan benefit denials":

> (1) Apply the de novo standard to determine whether the claim
> administrator's benefits-denial decision is "wrong" (i.e., the court
> disagrees with the administrator's decision); if it is not, then end
> the inquiry and affirm the decision.

---

[12]  The parties disagree on whether the Motions before the Court are more
appropriately styled as a Rule 56 Motion for Summary Judgment or a Rule 52 Motion
for Judgment on the Papers.  The cross-motions filed by Plaintiff and Defendants are
best viewed as Motions for Summary Judgment because the administrative record
presents the undisputed facts in this action, based upon which the Court must make a
determination.

(2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision."

(3) If the administrator's decision is "de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.[13]

Williams, 373 F.3d at 1137-38.

---

[13]   The Supreme Court's decision in Metro. Life Ins. Co. v. Glenn, cast doubt on the sixth step of this procedure.  554 U.S. 105, 128 S. Ct. 2343, 2350-51, 171 L. Ed. 2d 299 (2008) (conflict of interest should be weighed as one factor in determining whether administrator abused discretion but no change in standard of review required by existence of conflict).  However, the sixth step of the ERISA review framework is not applicable in this case because the Retirement Board does not have a conflict of interest.  As noted above, the Retirement Board consists of six members equally chosen by the NFLPA and the NFLMC.  Further, the Plan is funded by the 32 clubs of the NFL, not the Board.  Also, the 32 clubs fund the plan by making contributions to a trust "as actuarially determined to be necessary to fund the benefits provided in this Plan."  (AR at 001N).  The Eleventh Circuit has previously held that "no conflict of interest exists where benefits are paid from a trust that is funded through periodic contributions so that the provider incurs no immediate expense as a result of paying benefits."  White v. Coca-Cola Co., 542 F.3d 848, 858 (11th Cir. 2008) (citation omitted).

AO 72A
(Rev.8/82)

Therefore, the first step for the Court is to examine the Plan's terms and the administrative record[14] to determine whether the Court agrees with the Retirement Board's decision.  A decision is "wrong" if, after a review of the decision of the administrator from a *de novo* perspective, "the court disagrees with the administrator's decision."  Id. at 1138 n.8.  "[W]hen the court makes its own determination of whether the administrator was "wrong" to deny benefits under the first step of the Williams analysis, the court applies the terms of the policy."  Ruple, 340 Fed. Appx. at 611.  The Plan sets forth specific impairment thresholds determined by using the AMA Guides that a former NFL player must meet in order to qualify for LOD benefits.  (AR at 001CC).  Relevant to this action is the threshold for LEI and WPI, which are respectively 38% and 25%.  Dr. Langer's rating of Plaintiff's LEI and WPI, 59% and 28%, were both sufficient to meet the benefit qualification threshold.    Dr. Perry's rating of Plaintiff's WPI of 25% was also sufficient for Plaintiff to qualify for LOD benefits.  Finally, Dr. Bach's initial LEI and WPI ratings for Plaintiff, respectively 43% and 28%, were both sufficient to qualify Plaintiff for benefits.  Despite the fact that two of the three doctors to initially examine Plaintiff-

---

[14] The record to be considered is that which was before the administrator at the time its decision was made.  Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246 (11th Cir. 2008).

Thompson, Langer, and Perry-found that his impairments qualified him to receive benefits, the Retirement Board was deadlocked and referred the matter to Dr. Bach, the designated MAP.

The terms of the Plan specify that when the voting members of the Board are deadlocked as to a medical decision, that decision should be submitted to a MAP who is then required to make a "final and binding determination regarding such medical issues." Dr. Bach's initial report to the Retirement Board indicated that both Plaintiff's LEI and WPI qualified him to receive LOD benefits. While the Plan's language is silent about the Board reviewing the accuracy of the MAP's decision and his or her fidelity to the AMA Guides, the Board nonetheless examined the report and asked Dr. Bach to address specific concerns about compliance with the AMA Guides. In revising his initial findings, Dr. Bach rated Plaintiff's LEI at 33% and his WPI at 24%, both of which failed to meet the threshold levels of 38% and 25% necessary to qualify for LOD benefits. The Board used the revised findings to affirm the denial of LOD benefits to Plaintiff. In denying Plaintiff's request for benefits, "the Retirement Board concluded that Mr. Grant does not have a substantial disablement *within the meaning of the Plan*." (AR at 480 (emphasis added)).

13

After reviewing the extensive administrative record, the Court finds that the Board's decision was wrong.  The Court does not fault the Board for ignoring the medical opinions of the Drs. Langer and Perry because the terms of the Plan dictate that when the Board is deadlocked, it is the opinion of the MAP that is final and binding.[15]  However, the Board having taken it upon itself to ask Dr. Bach to reexamine his initial report to ensure conformity of ratings with the AMA Guides, as required by the Plan, erred in later ignoring Dr. Bach's purposeful disregard for the AMA Guides rating system.  The Board in its letter asking Dr. Bach to review his findings noted that his observations about Plaintiff's elbows constituted a ratable impairment under the AMA Guides.  However, in revising his analysis, Dr. Bach specifically told the Board that despite the fact that the AMA Guides would have credited Plaintiff with an impairment for his elbow based on flexion, he did not believe there was any such impairment.[16]

---

[15] "Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."  <u>Nord</u>, 538 U.S. at 834.  In this case, the Board's decision not to credit the opinions of Drs. Langer and Perry after it was deadlocked was dictated by the language of the Plan.  However, it is not clear that the Board gave adequate weight to the opinion of Dr. Langer before becoming deadlocked.

[16] Defendants states that "Dr. Bach and the Plan double-checked his impairment ratings, and Dr. Bach made corrections in the translation of physical findings and measurements into percentage impairment ratings using the AMA Guides

The Plan specifically states that "substantial disablement" for orthopedic impairments is determined using the AMA Guides. (Section 6.4(a)(4), AR at 001CC). The Board was cognizant of this requirement and asked Dr. Bach to reexamine his initial findings to ensure compliance with the AMA Guides' figures and tables. (AR at 461-462). Despite the deference given to the MAP in making medical decisions regarding orthopedic impairments, the Board cannot knowingly allow the MAP to disregard the plain language of the Plan by ignoring the impairment framework set forth in the AMA Guides. Therefore, the Plans decision to rely upon Dr. Bach's revised opinion after he explicitly stated that he did not credit Plaintiff with an impairment as directed by the AMA Guides, is wrong. The Board did not accurately determine whether Plaintiff has "a substantial disablement *within the meaning of the Plan*." (AR at 480 (emphasis added)).

Finding the Board's decision to be wrong on a *de novo* review is only the first step of the ERISA review process as set forth by the Eleventh Circuit. The second step is determining whether the Board was vested with discretion in reviewing claims. The Board does have discretion in interpreting and applying

_____

method." (Dkt. [20] at 6). However, Dr. Bach only made downward adjustments as he did not rate Plaintiff's elbow as an impairment as required by the AMA Guides.

the terms of the Plan.  (DSUMF at ¶ 13).  Therefore, the Court must proceed to the third step, which is to determine whether reasonable grounds supported the Board's decision to deny Plaintiff's application for LOD benefits. "When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard (sometimes used interchangeably with an abuse of discretion standard), the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." Jett v. Blue Cross and Blue Shield of Ala., Inc., 890 F.2d 1137, 1139 (11th Cir. 1989).

As with the initial *de novo* review, the appropriate starting point in "determin[ing] whether the administrator's denial of benefits was arbitrary and capricious, [is] the language of the Plan itself." Oliver v. Coca-Cola Co., 497 F.3d 1181, 1195 (11th Cir. 2007); see also Nord, 538 U.S. at 831, (quoting Firestone Tire, 489 U.S. at 115) ("[T]he validity of a claim to benefits under an ERISA plan" . . . "is likely to turn," in large part, "on the interpretation of terms in the plan at issue.").  An ERISA plan administrator must "discharge his duties with respect to a plan . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent

with the provisions of [ERISA]."  29 U.S.C. § 1104(a)(1)(D).  As discussed

above, the Plan requires the application of the AMA Guides in order to

determine whether a former NFL player has a "substantial disablement," such

that he qualifies for LOD benefits.  While the MAP has discretion in making the

final medical decision, the Plan dictates that the MAP's evaluation be based

upon the AMA Guides.  In this case Dr. Bach's initial report qualified Plaintiff

for LOD benefits.  The Retirement Board asked Dr. Bach to evaluate his report

to ensure that it complied with the AMA Guides.  In doing so, Dr. Bach's

revised impairment ratings of Plaintiff fell short of the threshold for receiving

benefits.  Yet in reaching his revised ratings, Dr. Bach informed the Retirement

Board that he was disregarding a portion of the AMA Guides that would credit

Plaintiff with an impairment.  (AR at 469).  As Defendant itself notes, "the

Retirement Board cannot abandon the Plan terms reached by the collective

bargaining parties. . . ."  (Dkt. 20 at 8 (citing 29 U.S.C. § 1132(a)(1)(B) (plan

participant has a right "to recover benefits due to him under the terms of the

plan"); 29 U.S.C. § 1104(a)(1)(D) (fiduciary duties must be discharged in

"accordance with the documents and instruments governing the plan")).

Therefore, it was an abuse of discretion to allow Dr. Bach to submit an

impairment evaluation that openly disregarded the AMA Guides.  This is

17

particularly the case here, where his initial evaluation qualified Plaintiff for benefits, but the Board sought a revised evaluation to ensure compliance with the AMA Guides.  Because it was an abuse of the Board's discretion to allow the terms of the Plan to be ignored, their decision must be vacated.

The Court is not in a position to determine whether appropriately giving Plaintiff credit for his elbow impairment, as the AMA Guides require, is sufficient to raise his WPI from 24% to the threshold level of 25%.  Therefore, this case must be remanded back to the Board to conduct an evaluation that complies with the language of the Plan, and thus arrives at impairment ratings as dictated by the AMA Guides.  Plaintiff also contends that Dr. Bach misapplied the AMA Guides in rating some of Plaintiff's impairments.  (See Plaintiff's Additional Material Facts, Dkt. [18] at ¶¶ 7, 8, 11, 12).  In reexamining Plaintiff's impairments, the Board or a MAP to which it refers the medical question, should be cognizant of Plaintiff's critique of Dr. Bach's evaluation.  Plaintiff was not in a position to offer this critique prior to the Board's decision because he did not have a copy of Dr. Bach's report, but now that it has access to Plaintiff's critique, the Board must take it into account in

AO 72A
(Rev.8/82)

making its decision.[17]  See Shannon v. Jack Eckerd Corp., 113 F.3d 208, 210

(11th Cir. 1997) (court did not err in directing administrator to consider

subsequently available evidence on remand);[18] 29 C.F.R. § 2560.503-

_____

[17] While the Board may not have been required to provide Dr. Bach's report to Plaintiff prior to issuing its decision, the Court finds it troublesome that it had a unilateral opportunity to critique what the terms of the Plan refers to as a final and binding opinion, but denied that same opportunity to Plaintiff.

Plaintiff claims that he was denied a full and fair review because he was not given Dr. Bach's report prior to the Board's decision.  Because the Court has found that the Board's decision was an abuse of its discretion, it need not reach this issue, but will offer the following observation.  The Eleventh Circuit in Glazer, 524 F.3d at 1245-46, held that a medical record relied upon by a plan administrator during the review of a denial of benefits does not have to be produced prior to the administrator's decision for the claimant to receive "a full and fair review." While there are distinctions between this case and Glazer, that case likely controls here, and Plaintiff was not entitled to Dr. Bach's report before the Retirement Board reached its final decision.

As the Eleventh Circuit noted, "a document is relevant if it was relied upon or was submitted, considered, or generated in the course of making the benefit determination." Id. at 1245 (citation omitted).  In Glazer, the Court noted that the benefits provider "had not 'relied upon' the . . . report or used the report 'in the course of making the benefit determination' until that determination had been made." Id. The terms of the Plan at issue in this instance, envision that the MAP's opinion will not only be relied upon by the Retirement Board, but is final and binding upon them in regards to medical issues.  Additionally, the type of review at issue in Glazer, a doctor's peer review of plaintiff's medical records, is distinguishable from Dr. Bach's in-person examination of Plaintiff, following which he drew conclusions based upon his own observations.  Despite these distinctions, Glazer likely dictates that Plaintiff was not entitled to Dr. Bach's report prior to receiving a final decision from the Board.  While the Court is troubled by the Board's critique of what the Plan's terms describe as a final and binding determination without Plaintiff having a similar opportunity to critique, it cannot say that Plaintiff was legally entitled to the report before the Board made its decision.

[18] Citing Bucci v. Blue Cross-Blue Shield of Conn., 764 F. Supp. 728, 732 (D. Conn. 1991) (holding that since a defendant's duty to provide benefits "is a continuing

1(h)(2)(iv)(plan administrator must "take[] into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination").

## Conclusion

Defendant's Motion for Summary Judgment [12] is **DENIED**.  The Court finds that the Retirement Board's decision to affirm the denial of LOD benefits to Plaintiff was wrong, and arbitrary and capricious.  However, the Court is not in a position to determine whether accurately construing Dr. Bach's observations in light of the AMA Guides allows Plaintiff to meet the impairment threshold necessary to qualify for LOD benefits.  Therefore, Plaintiff's Motion for Judgment [13] is **DENIED**.  The decision of the Retirement Board is **VACATED**, and Plaintiff's appeal is **REMANDED** to the Retirement Board to make a decision consistent with the terms of the Plan.

---

one, its refusal to provide benefits is thus a continuing denial, the propriety of which is measured against the information available from time to time").

20

**SO ORDERED**, this  21st  day of September, 2010.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)