# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

WILLIE GRANT,                          :
                                       :
      Plaintiff,               :
                                       :
v.                                     :    CIVIL ACTION NO.
                                       :    1:09-CV-1848-RWS
BERT BELL / PETE ROZELLE               :
NFL PLAYER RETIREMENT                  :
PLAN,                                  :
                                       :
      Defendant.               :

## ORDER

This case comes before the Court on Defendant's Renewed Motion for Summary Judgment [31] and Plaintiff's Motion for Judgment [32]. After considering the record, the Court enters the following Order.

## Background[1]

Plaintiff Willie Grant appeals the denial of line-of-duty ("LOD")

---

[1]Except as otherwise indicated, the facts in this Background section are taken from the Court's Order of September 21, 2010. (*See* Order, Dkt. No. [21] (denying Defendant's original Motion for Summary Judgment [12], denying Plaintiff's original Motion for Judgment [13], and remanding case to the Retirement Board (the "Board") for further consideration of Plaintiff's claim) (hereinafter "Remand Order").) Consistent with the Remand Order and for the convenience of the parties, citations to the Plan document and other documents in the Administrative Record are provided and follow the format "AR at [page number]."

disability benefits provided under the Defendant Bert Bell/Pete Rozelle NFL

Player Retirement Plan (the "Plan"), an employee benefit plan governed by the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§

1001, *et seq.* Grant is a former National Football League ("NFL") player and is

a participant in the retirement plan at issue by virtue of his NFL career. The

Plan–the product of a collective bargaining agreement between the National

Football League Players Association ("NFLPA")[2] and the National Football

League Management Council ("NFLMC")[3]–is a retirement plan that provides

retirement, disability, and related benefits to eligible NFL players.

On March 12, 2008, the Plan received an application for LOD disability

benefits submitted by Grant's counsel. (AR at 301-304.) In support of his

application, Plaintiff identified as injuries, "(1) Degenerative Left Knee with

Surgery; (2) Degenerative Right Knee with Surgery; (3) Fracture Left Knee

Cap; (4) Degenerative Left Hip; (5) Degenerative/ Torn Ligament Right Pinky;

(6) Degenerative Bi-Lateral Elbows." (AR at 303.) The pertinent Plan

provisions governing entitlement to LOD benefits are as follows:

---

[2] The NFLPA is the sole and exclusive bargaining representative of NFL players.

[3] The NFLMC is the sole and exclusive bargaining representative of the NFL teams, which are the employers in the context of the Plan.

2

6.1     Line-of-Duty Disability Benefits

Any Player who incurs a "substantial disablement" (as
defined in Section 6.4(a) and (b)) "arising out of League
football activities" . . . will receive a monthly line-of-duty
disability benefit . . . continuing for the duration of such
substantial disablement but not for longer than 90 months.

6.4     Definitions

(a)     For applications received on or after May 1, 2002, a
        "substantial disablement" is a permanent disability
        that . . .

        (4)     For orthopedic impairments, using the
                American Medical Association *Guides to the
                Evaluation of Permanent Impairments* (Fifth
                Edition, Chicago, IL) ("AMA Guides"), is (a) a
                38% or greater loss of use of the entire lower
                extremity; (b) a 23% or greater loss of use of
                the entire upper extremity; (c) an impairment to
                the cervical or thoracic spine that results in a
                25% or greater whole body impairment; (d) an
                impairment to the lumbar spine that results in a
                20% or greater whole body impairment; or (e)
                any combination of lower extremity, upper
                extremity, and spine impairments that results in
                a 25% whole body impairment.

                In accordance with the AMA Guides, up to
                three percentage points may be added for
                excess pain in each category above ((a) through
                (e)).

(AR at 001BB-001CC.)

AO 72A
(Rev.8/82)

In order to evaluate Plaintiff's LOD benefits claim, Plaintiff was referred by the Plan to Terry L. Thompson, M.D., an orthopaedist, for a medical evaluation. Dr. Thompson examined Plaintiff on April 9, 2008 (AR at 313-15); he rated Plaintiff's upper extremity impairment ("UEI") at 1%, lower extremity impairment ("LEI") at 15%, and the combined whole person impairment ("WPI") (*i.e.*, "whole body impairment") at 9%, which percentage included a 2% upward adjustment for excess pain (AR at 308). Because Dr. Thompson's findings failed to meet the threshold requirements for receipt of LOD benefits under Section 6.4(a)(4) of the Plan, the Disability Committee[4] denied Plaintiff's claim for benefits. (AR at 323.) Plaintiff was informed that he could appeal the Committee's decision to the Plan's Retirement Board (the "Board") (AR at 323), which he did on November 21, 2008 (AR at 334).

Under the terms of the Plan, the Board is the "named fiduciary" of the Plan within the meaning of section 402(a)(2) of ERISA and consists of three voting members appointed by the NFLPA and three voting members appointed by the NFLMC. (Plan § 8.2, AR at 001FF.) The Board has "full and absolute

---

[4] The Disability Initial Claims Committee ("Disability Committee") is responsible for deciding all initial claims for disability benefits under the Plan. It consists of two members, one appointed by the NFLPA and one appointed by the NFLMC. Appeals of decisions made by the Disability Committee are heard by the Retirement Board.

AO 72A
(Rev.8/82)

discretion, authority, and power" to, *inter alia*, define and interpret the terms of the Plan, decide claims for benefits under the Plan, and generally manage and administer the Plan. (Id., AR at 001FF-001GG.) If the voting members of the Board are deadlocked with respect to a medical decision, including "whether an applicant meets the requisite percentage disability requirements to be eligible for line-of-duty disability benefits," the Board may submit the medical decision to a Medical Advisory Physician ("MAP"). (Plan § 8.3(a), AR at 001GG-001HH.) In turn, the MAP has "full and absolute discretion, authority and power" to make "a final and binding determination regarding such medical issues." (Id.)

Shortly after submitting an appeal to the Board, Plaintiff retained and was examined by Phillip R. Langer, M.D. on December 18, 2008. Dr. Langer rated Plaintiff's LEI at 59% and WPI at 32%. (AR at 354-355.) These ratings both met the threshold percentage requirements for LOD benefit eligibility. (*See* Plan § 6.4(a)(4), AR at 001CC.) In connection with the appeal, the Plan also arranged for another medical evaluation by orthopaedist Glenn Perry, M.D. Dr. Perry rated Plaintiff's UEI at 4%, his LEI at 35%, and his lumbar spine at 8%, for a combined WPI rating of 25%, including a 2% upward adjustment for

excess pain. (AR at 413-14.) Dr. Perry's rating of Plaintiff's WPI met the

Plan's threshold for LOD benefits. (*See* Plan § 6.4(a)(4), AR at 001CC).

The Retirement Board asked its Medical Director, Stephen S. Haas,

M.D., to comment on the ratings of the Plan's physicians, Drs. Thompson and

Perry. After reviewing the reports of Drs. Thompson and Perry, Dr. Haas

concluded, "I am unable to reconcile Thompson's and Perry's ratings; therefore,

I believe that these inconsistencies should be resolved through an evaluation by

one of our MAPs." (AR at 426.) Accordingly, the Board referred Plaintiff's

claim to an MAP for evaluation. (AR at 432.) The MAP that evaluated

Plaintiff was Bernard R. Bach, Jr., M.D., an orthopaedist. (AR at 434.) Dr.

Bach evaluated Plaintiff on March 16, 2009 and rated his UEI at 2%, his lumbar

spine WPI at 8%, his LEI at 43%, and his combined WPI at 28%. (AR at 448-

452.) Dr. Bach's rating of Plaintiff's LEI and WPI each met the Plan's

threshold for the receipt of LOD benefits. (*See* Plan § 6.4(a)(4), AR at

001CC).

On March 26, 2009, the Plan Office sent Dr. Bach a memorandum

acknowledging receipt of his evaluation and asking him to review his findings

for compliance with the AMA Guides. (AR 461-462.) Specifically, the Plan

Office commented on his findings regarding Plaintiff's right little finger,

6

elbows, left hip, left knee, and right knee. (Id.) With regard to Plaintiff's right

little finger and left hip, the Plan Office noted that Dr. Bach's impairment

ratings were not consistent with the AMA Guides. (Id.) With regard to

Plaintiff's knees, the Plan Office noted that Dr. Bach combined values that

under the AMA Guides should not be combined in determining the impairment

percentage. (Id. at 461.) Finally, with regard to Plaintiff's elbows, the Plan

Office noted that Dr. Bach had measured a degree of elbow flexion that under

the AMA Guides constituted a ratable impairment, and yet had rated Plaintiff's

elbow as having a 0% impairment. (Id.) The Plan Office asked Dr. Bach to

"review [his] Physician's Report Form and narrative and submit any

changes/comments to the Plan Office . . . ." (Id. at 462.)

On April 17, 2009, Dr. Bach sent a letter to the Plan Office stating that he

had reviewed his examination and findings, as requested by the Plan Office,

and was revising his calculations. (AR at 469.) Dr. Bach's revised conclusion

was that Plaintiff had an LEI rating of 33% and a WPI rating of 24%, the latter

of which included a 2% upward adjustment for pain.[5] (Id.) With specific

regard to Plaintiff's elbow, Dr. Bach also stated:

---

[5] As the Court noted in the Remand Order, only Plaintiff's LEI and WPI ratings
are relevant to this action. (Remand Order, Dkt. No. [21] at 12.)

> As I commented to you at our symposium in Dallas regarding [Plaintiff], the range of motion that he has, although it would qualify him based on goniometric measurements as symmetric to his opposite elbow, he does not have arthritis in his elbows and I do not believe *despite the fact that the AMA Guide to Impairment would credit him with a potential impairment for his elbow based on flexion*, that this is symmetric and related to his biceps bulk.

(Id. (emphasis added).)

On May 27, 2009, the Board notified Plaintiff that it was denying his appeal and affirming the earlier denial of LOD benefits. (AR at 479.) The Board noted that "[b]ased on Dr. Bach's final and binding impairment rating, the Retirement Board concluded that [Plaintiff] does not have a substantial disablement within the meaning of the Plan." (Id.) As set forth above, the threshold impairment level necessary to qualify for LOD benefits is an LEI of 38% or a WPI of 25%. (AR at 001CC.)

Following the Board's denial of Plaintiff's appeal, Plaintiff initiated this action under ERISA on July 9, 2009. (Compl., Dkt. No. [1] ¶ 4.) On October 26, 2009, the parties filed cross-motions for summary judgment.[6] Utilizing the Eleventh Circuit's six-step framework for judicial review of ERISA-plan

_____

[6] Although Plaintiff's motion [13] was styled "Motion for Judgment," the Court treated it as a motion for summary judgment. (*See* Remand Order, Dkt. No. [21] at 10 n.12 ("The cross-motions filed by Plaintiff and Defendant are best viewed as Motions for Summary Judgment because the administrative record presents the undisputed facts in this action, based upon which the Court must make a determination.").)

AO 72A
(Rev.8/82)

benefit denials, the Court denied Defendant's motion [12], reasoning that the Board's decision to deny Plaintiff benefits was "wrong" and an "abuse of discretion." (Remand Order, Dkt. No. [21] at 14, 18.) The Court reached these conclusions on grounds that the Board's decision was predicated on the revised report of Dr. Bach, which was plainly inconsistent with the AMA Guides in that it failed to give Plaintiff an impairment rating for his elbow, despite Dr. Bach's finding that under the AMA Guides his limited degree of elbow flexion constituted a ratable impairment. (Id.) The Court also denied Plaintiff's motion for summary judgment [13], reasoning that the Court was not in a position to determine whether giving Plaintiff an impairment rating for his elbow would render him eligible for LOD benefits under the terms of the Plan. (Id. at 18.) The Court thus remanded the case to the Board to reevaluate Plaintiff's claim so as to arrive at impairment ratings consistent with the AMA Guides.[7] (Id.)

In accordance with the Remand Order, on October 27, 2010, the Board requested Dr. Bach to reconsider Plaintiff's claim. (AR at 001082-001083.)

---

[7] The Court instructed the Board as follows: "[T]his case must be remanded back to the Board to conduct an evaluation that complies with the language of the Plan, and thus arrives at impairment ratings as dictated by the AMA Guides. . . .  In reexamining Plaintiff's impairments, the Board or a MAP to which it refers the medical question, should be cognizant of Plaintiff's critique of Dr. Bach's evaluation." (Remand Order, Dkt. No. [21] at 18.)

9

The Board specifically asked Dr. Bach to (1) explain his 0% impairment rating of Plaintiff's elbow and whether it is consistent with the AMA Guides; (2) confirm that he has reviewed the Remand Order and the entire Administrative Record–including all medical evaluations conducted by non-Plan physicians and Plaintiff's critiques of Dr. Bach's evaluations; (3) indicate whether additional points are appropriate for adduction in Plaintiff's left hip or patellafemoral arthritis in his left knee;[8] and (4) advise whether Dr. Bach "continue[s] to believe that [Plaintiff's] WPI is 24% (including 2% for pain), upper extremity is 4%,[9] lower extremity is 33%, and lumbar spine is 8%." (Id.)

Dr. Bach responded to the Board's request in a report dated November 1, 2010. (AR at 001084-001085.) With respect to Plaintiff's elbows, Dr. Bach explained his 0% impairment rating as follows:

> Apparently, one of the key issues [in the Court's Remand Order] was my 0% impairment specific to [Plaintiff's] elbows. It should

---

[8] In addition to arguing that his limited elbow flexion constitutes a ratable impairment, Plaintiff also argues that he should have been given an impairment rating for adduction in his left hip, which he contends Dr. Bach improperly failed to test, and patellafemoral arthritis in his left knee–as found by Dr. Langer. (Pl.'s Mot. for J., Dkt. No. [32-1] at 9-10.)

[9] The Plan incorrectly indicated that Dr. Bach's UEI finding was 4% when it was in fact 3%. (Def.'s Renewed Mot. for Summ. J., Dkt. [31-1] at 8 n.2.) (See also AR at 469 (showing Dr. Bach's 3% UEI finding).) Dr. Bach repeated this mistake in the Report he sent to the Board on remand. (AR at 001085.)

be noted that individuals with increased muscle bulk may have
reductions in ranges of motion attributed to muscle bulk rather than
actual loss of motion secondary to pathology.  This is the specific
reason why I did not allot him a rating specific to his elbows. . . .
In summary, it is my opinion that he has no impairment specific to
his elbows.  What minimal restriction that he has in elbow flexion
is secondary to, in my opinion, his muscle biceps bulk and not
related to inherent capsular contractions ore [sic] degenerative joint
disease.

(AR at 001084-001085.)  With respect to Plaintiff's contentions regarding his

left hip and left knee, Dr. Bach stated, "Additionally, I have no comment with

regards to the adduction grade that Dr. Langer provided in December of 2008 or

his comments with regards to patellafemoral arthritis in the left knee.  My

opinion remains that [Plaintiff's] WPI is 24%, which includes 2% for pain, the

upper extremity being 4%, the lower extremity 33%, and the lumbar spine 8%."

(AR at 001085.)

By letter to Plaintiff's counsel dated December 15, 2010, the Board once

again denied Plaintiff's claim for LOD benefits based on Dr. Bach's November

1, 2010 report.  (AR at 001086-001087.)  The Board explained its decision as

follows:

The Retirement Board concluded that Dr. Bach applied the AMA
Guides to [Plaintiff's] elbow flexion appropriately.  The
Retirement Board noted that it would be perverse to award an

11

AMA Guides impairment rating where there is no underlying impairment, as is the case with Plaintiff's elbow flexion. The Retirement Board also noted that Dr. Bach's determination is consistent with the principles set forth in section 1.2 of the AMA Guides, which state that there is room for judgment where, as in the case of athletes, the normal range-of-motion measurements for the population as a whole do not represent the normal for the individual at issue. Finally, the Retirement Board found that Dr. Bach reviewed your critiques of Dr. Langer's comments, yet did not alter his ratings of [Plaintiff's] impairments. The Retirement Board noted that Dr. Bach's ratings are final and binding under Plan section 8.3. The Retirement Board thus was required to find that [Plaintiff] does not have a substantial disablement within the meaning of the Plan, and therefore that [Plaintiff] does not qulaify for LOD benefits.

(AR at 001087.) Defendant has now filed a Renewed Motion for Summary Judgment [31]. Plaintiff has also filed a second Motion for Judgment [32], which the Court will treat as a motion for summary judgment.[10]

## Discussion

ERISA was enacted by Congress "to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 830

---

[10] As explained in the Remand Order and in footnote 7 of this Order, *supra*, the cross-motions before the Court are best viewed as motions for summary judgment, given that the Administrative Record contains the undisputed material facts, based upon which the Court must decide whether Defendant's denial of Plaintiff's claim for LOD benefits was lawful.

AO 72A
(Rev.8/82)

(2003) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113

(1989)).  To that end, ERISA allows a person denied benefits under an

employee benefit plan to challenge that denial in federal court.  29 U.S.C. §

1132(a)(1)(B).  ERISA does not, however, set out standards for district courts to

follow in reviewing an ERISA plan administrator's decision to deny benefits.

Doyle v. Liberty Life Assurance Co., 542 F.3d 1352, 1355 (11th Cir. 2008)

(citing Firestone Tire, 489 U.S. at 109).  Accordingly, the Eleventh Circuit has

established a six-step framework "for use in judicially reviewing virtually *all*

ERISA-plan benefit denials."  Williams v. BellSouth Telecomms., Inc., 373

F.3d 1132 (11th Cir. 2004)   In Blankenship v. Metro. Life Ins. Co., 644 F.3d

1350, 1354-55 (11th Cir. 2011), the Eleventh Circuit modified the sixth step of

the Williams framework to reflect the decision of the United States Supreme

Court in Metropolitan Life Insurance Company v. Glenn, 554 U.S. 105, 129

(2008).  Accordingly, the six-step framework governing the Court's review in

this case is as follows:[11]

> (1)   Apply the *de novo* standard to determine whether the claim
>        administrator's benefits-denial decision is "wrong" (i.e., the court

---

[11]  This framework applies at the summary judgment stage and displaces the
traditional summary judgment analysis.  See, e.g., Ruple v. Hartford Life & Accident
Ins. Co., 340 Fed. Appx. 604, 610 (11th Cir. 2009) ("The typical summary judgment
analysis does not apply in ERISA cases.") (quotations omitted).

disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2)    If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

(3)    If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4)    If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5)    If there is no conflict, then end the inquiry and affirm the decision.

(6)    If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

Id. at 1355.

In this case, the Court has already determined that the Board has discretion in interpreting and applying the terms of the Plan. (Remand Order, Dkt. No. [21] at 15-16.) The Court has also determined that the Board was not operating under a conflict of interest. (Id. at 11 n.13.) Thus, in reviewing the cross motions for summary judgment currently before the Court, the Court's analysis is limited to only two steps: first, applying a *de novo* standard of review, the Court must determine whether the Board's decision, on Remand,

14

denying Plaintiff benefits was wrong; and second, if wrong, whether the decision nonetheless was supported by reasonable grounds such that it should be affirmed.

To determine under the first step whether the Board's decision was "wrong," the Court must examine the terms of the Plan and the administrative record[12] to determine whether the Court agrees with the Board's decision. A decision is "wrong" if, after a review of the decision of the administrator from a *de novo* perspective, "the court disagrees with the administrator's decision." Williams, 373 F.3d at 1138 n.8. "[W]hen the court makes its own determination of whether the administrator was "wrong" to deny benefits under the first step of the Williams analysis, the court applies the terms of the [Plan]." Ruple, 340 Fed. Appx. at 611. See also Brannon v. BellSouth Telecomms., Inc., 318 F. App'x 767, 769 (11th Cir. 2009) ("In our *de novo* review, we turn first to the plan itself.").

The Court thus first considers the terms of the Plan itself. As stated above and as found in the Court's Remand Order, under the Plan, a former NFL

---

[12] The record to be considered is that which was before the administrator at the time its decision was made. Glazer v. Reliance Standard Life Ins. Co., 524 F.3d 1241, 1246 (11th Cir. 2008).

player such as Plaintiff qualifies for LOD benefits if the player incurs a "substantial disablement . . . arising out of League football activities." (AR at 001BB.) With regard to an orthopedic disablement,[13] the Plan defines "substantial disablement" as (1) a 38% or greater lower extremity impairment ("LEI") or (2) any combination of lower extremity, upper extremity, and spine impairments resulting in a 25% or greater whole body impairment ("WPI").[14] (AR at 001CC.) The Plan requires that these percentages be calculated in accordance with the AMA Guides. (Id.) Finally, if the voting members of the Board are deadlocked with respect to deciding whether a claimant satisfies these percentage requirements, the Plan provides that the Board may submit that medical question to an MAP for a final and binding determination. (AR at 001GG-001HH.) In such a case, the MAP is granted "full and absolute discretion, authority and power" to decide whether the claimant satisfies the threshold disability requirements for receipt of benefits. (AR at 001HH.)

In this case, and as stated in the Background above, the Board initially denied Plaintiff's appeal on the basis of the revised findings of Dr. Bach, which

---

[13] While the Plan recognizes other forms of disablement (AR at 001BB-001CC), Plaintiff's claim for LOD benefits only concerns orthopedic disability.

[14] These are not the only forms of orthopedic disability recognized under the Plan (AR at 001CC) but the only two that are relevant in this case.

16

gave Plaintiff an LEI rating of 33% and a WPI rating of 24%–both of which

ratings fell short of the percentages required to receive LOD benefits under the

terms of the Plan.[15]  The Court found this decision by the Board to be wrong

(and an abuse of discretion), however, given that Dr. Bach's report appeared to

disregard the AMA Guides in refusing to give Plaintiff an impairment rating for

his elbows, despite Dr. Bach's finding of limited elbow flexion.  Thus on this

basis, the Court remanded Plaintiff's claim back to the Board to determine his

claim in a manner consistent with the requirements of the Plan and the AMA

Guides.

_____

[15] As the Court also noted in the Remand Order, it is somewhat troubling that the Board requested Dr. Bach to review his findings when under the terms of the Plan, an MAP's conclusions are "final and binding." (AR at 001HH.)  (The Plan itself is silent as to the propriety of such action.)  This is particularly the case given that after reviewing his findings, Dr. Bach adjusted his ratings only in the downward direction, rendering Plaintiff ineligible for LOD benefits.  However, it does not appear to the Court that the Board was attempting to induce Dr. Bach to reduce his impairment ratings.  On the contrary, the Board pointed out to Dr. Bach that he had improperly failed to give Plaintiff an impairment rating for his elbow.  (AR at 461.)  Even more importantly, the Court notes that had the Board accepted Dr. Bach's findings, knowing they were not consistent with the AMA Guides, any resulting decision certainly would have been wrong and an abuse of discretion as under the terms of the Plan, disability must be determined in accordance with the AMA Guides.  This was, in fact, the precise rationale behind the Court's Remand Order: the Court determined that the Board's denial of benefits was wrong and unreasonable because the Board relied on the revised evaluation of Dr. Bach, which the Court found was *inconsistent with the AMA Guides* for failing to give Plaintiff an impairment rating for elbow flexion. (Remand Order, Dkt. No. [21] at 14, 17.)

Having remanded the case to the Board, and having now considered Dr.

Bach's explanations of his conclusions and the Board's renewed decision to

deny Plaintiff's claim, the Court cannot conclude that the Board's decision was

"wrong." Under the terms of the Plan, once the Board refers the medical

question of whether a claimant qualifies for LOD benefits to an MAP, the

MAP's conclusions are final and binding on the Board. Accordingly, so long as

the MAP's conclusions are reached in accordance with the AMA Guides, the

Board is *required under the terms of the Plan* to accept those conclusions. In

other words, under the terms of the Plan, once the Board refers the medical

question to an MAP, the Board is *prohibited* from relying on the opinions of

other physicians in deciding whether to grant or deny benefits.[16]

On remand, Dr. Bach explained to the Board that his decision to give

Plaintiff a 0% impairment rating for his elbows, despite Dr. Bach's finding of

limited elbow flexion, was based on his determination that the limitation in

flexion was a result of Plaintiff's biceps muscle bulk rather than any pathology.

The Board found this conclusion to be consistent with the AMA Guides. In

---

[16] Indeed, in the Remand Order, the Court stated, "The Court does not fault the Board for ignoring the medical opinions of the Drs. Langer and Perry *because the terms of the Plan dictate that when the Board is deadlocked, it is the opinion of the MAP that is final and binding*." (Dkt. No. [21] at 14 (emphasis added).)

addition, the Board explicitly requested Dr. Bach to consider Dr. Langer's

assessment of hip adduction and patellafemoral arthritis in Plaintiff's left knee.

In response, Dr. Bach indicated that he had "no comment" and that it remained

his opinion that Plaintiff had an LEI of 33% and WPI of 24%. Given the final

and binding nature of the medical conclusions of a Plan MAP, the Board

accepted Dr. Bach's report and on that basis denied Plaintiff's claim. The Court

concludes that this decision was not wrong. On the contrary, the Court finds

that this decision was required under the terms of the Plan.

Plaintiff argues that the Board's decision was "wrong" for a variety of

reasons, none of which is persuasive to the Court. (Pl.'s Mot. for J., Dkt. No.

[32-1] at 16-17.) First, Plaintiff argues in vague terms that Dr. Bach failed to

follow the AMA Guides. (Id. at 16.) The Court, however, cannot find that Dr.

Bach's assessment is contrary to the AMA Guides. In its Remand Order, the

Court found Dr. Bach's report to be contrary to the AMA Guides only insofar

as he did not give Plaintiff an impairment rating for his elbow when a rating

appeared to be required. Dr. Bach, however, has explained this decision; like

the Board, the Court agrees it was not contrary to the AMA Guides given Dr.

Bach's opinion that the limitation in Plaintiff's elbow flexion is not the result of

pathology caused by football activities but is instead the result of Plaintiff's muscle bulk. The Board's reliance on Dr. Bach's opinion thus was not "wrong."

Plaintiff also argues the Board's decision was "wrong" because the Board failed to insist that Dr. Bach "address the outstanding left hip and left knee issues." (Id. at 16-17.) It appears to the Court, however, that the Board did just that. As stated above, the Board requested Dr. Bach to review the entire administrative record, including the medical evaluations of Dr. Langer, and specifically asked Dr. Bach to determine whether additional points should be awarded for adduction in the left hip or patellafemoral arthritis in the left knee. Although Dr. Bach had few words to say regarding these matters ("no comment"), there is no indication that Dr. Bach ignored Dr. Langer's report. On the contrary, Dr. Bach appears to have considered Dr. Langer's assessment, only to find that he did not agree with it and thus would not change his own conclusions.[17]

_____

[17] Plaintiff makes much of the fact that Dr. Bach did not test hip adduction himself. (Pl.'s Mot. for J., Dkt. No. [32-1] at 9.) The Court, however, finds that the decision to conduct or not conduct certain tests is one of clinical judgment that courts of law generally should not second guess. Plaintiff also contends that Dr. Bach's findings indicate the existence of patellafemoral arthritis in Plaintiff's left knee, which Dr. Bach simply failed to recognize. (Id. at 10.) Specifically, Plaintiff contends that Dr. Bach found "(i) a history of direct patellafemoral trauma, (ii) patellafemoral pain,

Finally, Plaintiff contends the Board's decision was wrong because it failed to give credit "to the honest and accurate findings of Dr. Langer and Perry . . . ." (Id. at 17.) Under the terms of the Plan, however, the conclusions of Dr. Bach are final and binding on the Board. The Board thus was not permitted to accept the conclusions of Drs. Langer or Perry over those of Dr. Bach. Accordingly, its failure to accept the conclusions of Drs. Langer or Perry cannot possibly render the Board's decision "wrong."

In light of the Court's conclusion that the Board's decision was not "wrong," it need not determine whether the decision was supported by reasonable grounds or was, instead, an abuse of discretion. The decision of the Board should not be disturbed.

---

and (iii) crepitation," which under the footnote to Table 17-31 of the AMA Guides (AR at 1052) requires a 5% LEI rating for arthritis. (Id.) Again, however, the Court will not second guess a physician's decision as to whether certain clinical findings support a diagnosis of arthritis. Furthermore, after considering the report of Dr. Bach, it is not clear to the Court that Dr. Bach even found crepitation, as Plaintiff contends. On the contrary, Dr. Bach's original report shows a finding of "no significant crepitation on active flexion of [Plaintiff's] knees." (AR at 450.) In any event, these are medical decisions that must be left to a physician's judgment.

AO 72A
(Rev.8/82)

## Conclusion

Based on the foregoing, the Court hereby **GRANTS** Defendant's Renewed Motion for Summary Judgment [31] and **DENIES** Plaintiff's Motion for Judgment [32].

**SO ORDERED**, this  16th  day of December, 2011.

_____
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)